IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No. 08-cv-01503-RBJ-MJW

JIMMY MARTINEZ, et, al,

Plaintiffs,

v.

THE CITY AND COUNTY OF DENVER,

Defendant.

---

## ORDER

This case was originally filed by sixteen plaintiffs and styled as a class action lawsuit against the City and County of Denver, as well as the Denver Police Department ("DPD"). Plaintiffs are all current or former DPD officers and allege systematic racial and gender employment discrimination by the DPD. Judge Brimmer denied the motion for class certification [see docket # 75] and also partially granted a prior motion to dismiss, which dismissed several plaintiffs and Defendant DPD [see #68]. The case was reassigned to this Court on September 26, 2011. Defendant City and County of Denver ("Defendant") has filed five motions for summary judgment seeking to dismiss all claims against the remaining eight plaintiffs. The Court addresses all pending summary judgment motions.

### Facts

Plaintiffs filed suit on July 16, 2008, alleging four claims for relief: (1) discrimination in violation of Title VII; (2) retaliation; (3) violation of 42 U.S.C. § 1981; and (4) violation of 42 U.S.C. § 1983. Although these four claims are the only ones specifically enumerated in the

complaint, defendant also seeks summary judgment as to a hostile work environment claim

against some plaintiffs because they seemingly intended to make the claim based upon the facts

alleged.  At the trial preparation conference, the parties agreed that the hostile work environment

claim is part of the case.  As a result, the Court considers a hostile work environment as a fifth

claim for relief as to certain plaintiffs.

**Standard**

The Court may grant summary judgment if "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

moving party has the burden to show that there is an absence of evidence to support the

nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The nonmoving

party must "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324.  A

fact is material "if under the substantive law it is essential to the proper disposition of the claim."

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A material fact is genuine if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

The Court will examine the factual record and make reasonable inferences therefrom in the light

most favorable to the party opposing summary judgment.  *Concrete Works of Colorado, Inc. v.

City and County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

**Conclusions**

I.   <u>Defendant's Motion for Summary Judgment against Plaintiff Dean Abeyta [#107]</u>

Defendant seeks summary judgment against Plaintiff Dean Abeyta on all claims, which

arise out of his termination from DPD on July 24, 2007 and a corresponding charge he filed with

the Equal Employment Opportunity Commission ("EEOC") on April 3, 2007.

a.   *Facts*

In the early morning hours of June 4, 2006, Officer Abeyta was working as an off-duty police officer for a private business. Abeyta Depo. [#107-3] at 10:1-18. Officer Abeyta finished work around 3 AM and accompanied two women to a nearby park. *Id*. at 10:22-11:25. He had tequila in his car that night and shared it with the women, one of whom was not yet 21. *Id*. at 12. He knew these women worked at a "gentleman's club" and also admitted to having sexual relations with one of the women in his truck. *Id*. at 11-12. Although Officer Abeyta maintains the interaction was consensual, he was accused of sexual assault and arrested that same day. *Id*. at 13.

Officer Abeyta says he was questioned by Commander Lamb, the head of internal affairs, and he was placed on investigatory leave. *Id*. at 14. Although Officer Abeyta admits in his deposition that investigatory leave means he was still being paid, his briefing and his complaint claim that he was suspended without pay. *Id*. at 14:16-25; Abeyta Resp. [#117] at 3; Compl. [#1] ¶ 140. During the questioning, Officer Abeyta confirmed that one of the women left her underwear in his truck. Abeyta Depo [#107-3] at 18:6-13. At 6 PM that evening, Officer Abeyta signed a consent form permitting his vehicle to be searched. *Id*. at 19; [#107-5]. The consent recited Officer Abeyta's understanding of his constitutional right to refuse the search, and Officer Abeyta admits to understanding the form. [#107-3] at 19-20. Although the consent form assents to a search of his Dodge Durango without any listed limitations, Officer Abeyta maintains that the search was "supposed to be getting only the underwear," and that someone else wrote in the description of the truck on the consent form. *Id*.; [#107-5].

Police removed more than just the underwear from Officer Abeyta's vehicle, including a black bag with his personal items, which included a tape recorder. [#107-5]; [#107-3] at 25:23-

26:7.  On June 30, 2006, Lieutenant Joseph Montoya executed an affidavit for a search warrant

to listen to any recordings recovered, reasoning that they may contain additional evidence

regarding that night.  [#107-6].  Although these recordings did not contain anything related to the

June 4 incident, the recordings revealed Officer Abeyta having sexual relations with other

women, and noise from a police radio was also evident in the background.  [#107-3] at 39-40.

As a result of these events, Deputy Chief Michael Battista recommended Officer Abeyta

be terminated after a pre-disciplinary meeting.  [#107-3] at 49.  Officer Abeyta admits that it was

only a recommendation and that the Manager of Safety, Alvin LaCabe, would make the final

determination.  *Id*. at 49:11-16.  Although Officer Abeyta had never met Manager LaCabe at this

point, he did not "necessarily presume that was going to make a difference."  *Id*. at 49.

Before Manager LaCabe made any determination, Officer Abeyta filed a charge with the

EEOC on April 3, 2007, alleging national origin discrimination.  [#117-5].  In the charge, Officer

Abeyta says that he was subjected to different terms and conditions of employment compared to

non-Hispanic employees, and that the disciplinary review board recommended termination,

which he expected to be upheld by other management officials.  *Id*.  He claims that there are

"several similarly situated non-Hispanic individuals who have committed more egregious

offenses such as felonies, yet they were not terminated or disciplined as harshly."  *Id*.  Officer

Abeyta also says that his investigative process was more aggressive as compared to non-

Hispanic individuals, and that the investigators pursued other evidence unrelated to the original

allegations "in order to add charges to terminate my employment."  *Id*.

Approximately three weeks after Officer Abeyta filed this charge, Officer LaCabe

disapproved the recommendation to terminate Officer Abeyta, and he returned the case for

further investigation.  [#107-9](issued on April 24, 2007).  After an additional three months of

investigation, Manager LaCabe issued a departmental order of discipline terminating Officer

Abeyta's employment for violations of departmental rules including "immoral conduct," "off-

duty in a uniform," "departing from the truth" and "conduct prejudicial." [#107-1]. Manager

LaCabe explained the termination: "It was a sexual case…There was a finding of him giving

alcohol to a minor. There was a finding as to him not being completely truthful in the course of

the investigation a number of times. There was at least an admission by him, without any great

detail, of having sexual relations while he was technically in some way on the clock. There was

a tape found in which he recorded sexual encounters with other women, and it appeared that he

was doing this while he was on duty. Adding those things together, I terminated him." [#107-

10] at 94. Manager LaCabe also noted that the recommendation for termination was consistent

at every level of review, including the discipline review board. *Id.*

Officer Abeyta did not appeal this determination to the Civil Service Commission.

[#107-3] at 58. In his deposition, Officer Abeyta says that the Police Protective Association

refused to represent him to appeal his termination, and that an attorney would cost $40,000. *Id.*

at 58-59. Officer Abeyta also claims there were other officers caught having sex while on duty,

and nothing ever happened to them. *Id.* at 61:19-21; 65:23-66:3.

Officer Abeyta began working for DPD in 2001 after working for Fort Lupton's police

department for eight years. [#117-1] at 15. Officer Abeyta says that he had outstanding reviews

during this time, and other than the event in question, defendant has not offered any

contradictory evidence to suggest that Officer Abeyta had any unsatisfactory reviews or any

discipline history.

     b. *Conclusions*

         i. *Claim One: Discrimination in Violation of Title VII*

Because Officer Abeyta has not provided any direct evidence of discrimination, his Title VII claim is analyzed under the *McDonnell Douglas* burden-shifting framework. *See generally Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012). In the context of employment discrimination, a plaintiff must first establish a prima facie case of discrimination. *Id.* Once he does so, the employer must proffer a "legitimate, non-discriminatory reason for the adverse employment action." *Id.* "At the summary judgment stage, it then becomes the plaintiff's burden to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual – i.e. unworthy of believe." *Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312 (10th Cir. 2004) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).

In Officer Abeyta's case, his claim for discrimination is wrongful discharge. "To establish a prima facie case of discriminatory discharge based on national origin, the plaintiff must show that (1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after such discharge." *Sulich v. Sysco Intermountain Food Serv., Inc.*, 242 Fed. Appx. 532, 534 (10th 2007)(quoting *Rivera v. City and County of Denver*, 365 F.3d 912, 920 (10th Cir. 2004)). The Court finds that Officer Abeyta has satisfied this initial burden. As a Hispanic, he is a member of a protected class. Officer Abeyta had no negative work history prior to this incident, and there is no dispute that he was qualified for his job.

Because defendant has offered a legitimate, non-discriminatory reason for firing Officer Abeyta, it is Officer Abeyta's burden to establish that defendant's proffered reason is pretext for racial or national origin discrimination. *Khalik*, 671 F.3d at 1192 ("[T]he burden shifts back to the plaintiff to show that the plaintiff's protected status was a determinative factor in the employment decision or that the employer's explanation is pretext."); *See also Munoz v. St.*

*Mary-Corwin Hosp.*, 221 F.3d 1160, 1167 (10th Cir. 2000).  Officer Abeyta can show pretext by establishing "either that a discriminatory reason more likely motivated the employer or…that the employer's proffered explanation is unworthy of credence." *Munoz*, 221 F.3d at 1167.

Officer Abeyta relies upon his past positive employee performance reviews to argue that he was not terminated for "poor performance" and that the decision was pretextual.  He also argues that the factual findings leading to his termination were incorrect.  The Court has already considered Officer Abeyta's prior work performance in finding he has established a prima facie case.  His positive work reviews in the past do not render defendant's proffered explanation as unworthy of credence.

Officer Abeyta also disputes the finding that he was engaging in sexual relations while he was working, explaining that these incidents happened after he left work.  See [# 117-3] at 39:18-25, 40-41:1-19.   However, a court's role is not to "act as a 'super personnel department' that second guesses employers' business judgments."  *Simms v. Okla. Ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999)(citations omitted).  The "pertinent question" is whether the employer's belief was genuine or pretextual, not whether the employer was correct in thinking the employee engaged in misconduct.  *Hardy v. S.F. Phosphates Ltd.*, 185 F.3d 1076, 1080 (10th Cir. 1999)(citing *Giannopoulos v. Brach & Brock Confections, Inc*. 109 F.3d 406, 411 (7th Cir. 1997)).  The factual record before DPD included tapes of Officer Abeyta having sex with a police radio audible in the background.  This evidence alone suggests that DPD's proffered reason for his termination was genuine.

Finally, Officer Abeyta suggests that his termination was pretextual because DPD has a "history of non-Hispanic officers having inappropriate sexual relations while on duty and they were not terminated."  [#117] at 5.  Although he claims the department has a "history," Officer

Abeyta only cites to one deposition, that of co-plaintiff Detective Rojas, to support his argument

of pretext.  Officer Abeyta provides two pages of deposition testimony alleging that another

white detective was suspended but not terminated after having an "inappropriate interaction with

a female prostitute."  [#117-4] at 32:1.  This, by itself, fails to establish pretext.  Although

Officer Abeyta's argues that the white detective was on duty at the time, he does not cite to any

supporting evidence.  There is also no indication whether this white detective faced criminal

charges, whether any physical evidence against him existed, or whether this was a one-time

occurrence.  Ultimately, the Court lacks evidence to conclude that this white detective and

Officer Abeyta were similarly situated.  The unsubstantiated allegation from another plaintiff's

deposition testimony is insufficient to establish that a "discriminatory reason more likely

motivated the employer" when the employer had a very clear legitimate and non-discriminatory

reason for Officer Abeyta's termination.

Consequently, the Court finds Officer Abeyta has failed to establish a genuine dispute of

material fact concerning pretext.  Accordingly, the Court grants defendant's motion as to claim

one for discrimination under Title VII.

### ii.   *Claim two: Retaliation*

Officer Abeyta argues that DPD retaliated against him for filing his EEOC charge,

because he was only terminated after filing this EEOC charge.  "Title VII makes it unlawful to

retaliate against an employee because she has 'opposed' any practice made unlawful by Title

VII, or because she has 'participated … in an investigation, proceeding or hearing under this

subchapter.'"  *Annett v. University of Kansas*, 371 F.3d 1233, 1237 (10th Cir. 2004).  Title VII

retaliation claims apply the same burden-shifting framework as discrimination claims.  *Id*.  As a

result, Officer Abeyta must first establish a prima facie case of retaliation, which requires that:

(1) plaintiff engage in a protected opposition to discrimination; (2) plaintiff suffer an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action. *Id*; *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1252 (10th Cir. 2001). However, courts lack jurisdiction to consider Title VII claims that are not part of a timely-filed EEOC charge. *Annett*, 371 F.3d at 1238.

Although Officer Abeyta argues that DPD retaliated against him for filing his EEOC charge, he never filed any subsequent EEOC charge alleging retaliation. "[E]ach discrete retaliatory action constitutes its own unlawful employment practice for which administrative remedies must be exhausted." *Annett*, 371 F.3d at 1238 (internal quotations omitted). As a result, because Officer Abeyta never filed an EEOC charge alleging retaliation, he has failed to exhaust his administrative remedies regarding this claim. The Court also notes that Officer Abeyta would have a difficult time asserting this claim on the merits. In his April 3 EEOC charge, Officer Abeyta writes that the disciplinary review board had already recommended termination as of February 28, 2007, and he acknowledges that the recommendation "will be more than likely upheld by other management officials." [#107-2]. Officer Abeyta clearly anticipated his termination at the time that he filed his EEOC charge, undermining his ability to establish any causal connection between his termination and the filing of the very EEOC charge in which he admits that he expected to be fired.

The Court grants defendant's motion for summary judgment as to retaliation.

### iii. *Claims three and four: Sections 1981 and 1983*

Defendant also seeks to dismiss Officer Abeyta's claims under 42 U.S.C. § 1983, arguing that he cannot legally sustain any claim against a municipality. Although defendant makes no mention of § 1981, the Court presumes that defendant (and plaintiff) addressed these claims

together, because both § 1981 and § 1983 require a plaintiff to "demonstrate that the City's officials acted pursuant to a 'custom or policy' or 'discriminatory employment practices'" in order to establish municipal liability.  *Carney v. City and County of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008)(quoting *Randle v. City of Aurora*, 69 F.3d 441, 446 (10th Cir. 1995)).

However, in Officer Abeyta's case, the Court does not reach this question.  "In racial discrimination suits, the elements of a plaintiff's case are the same whether that case is brought under §§ 1981 or 1983 or Title VII."  *Carney*, 534 F.3d at 1273 (10th Cir. 2008)(quoting *Baca v. Sklar*, 398 F.3d 1210, 1218 n. 3 (10th Cir. 2005));  *See also Fulcher v. City of Wichita*, 387 Fed. Appx. 861, 864 (10th Cir. 2010)(noting that "the elements of a discrimination lawsuit are the same whether it is brought under  §§ 1981 or 1983 or Title VII).  As a result, Officer Abeyta's claims fail for the same reasons they fail under the Title VII analysis.  *See Baca*, 398 F.3d at 1218 n. 3(concluding that a plaintiff's racial discrimination claims fail under §§1981 and 1983 for the same reasons that they failed under Title VII because "[a] plaintiff who alleges discriminatory discharge on [these bases]…would have to establish the same elements in order to make out a prima facie case under the *McDonnell Douglas* burden-shifting analysis").  As a result, the Court grants defendant's motion for summary judgment as to both his § 1981 and § 1983 claims.

iv.  *Order*

The Court grants defendants' motion for summary judgment [#107] in its entirety.  All of Officer's Abeyta's claims are dismissed with prejudice.

II.    Defendant's Motion for Summary Judgment against Plaintiff Jimmy Martinez [#108]

Defendant seeks summary judgment as to all claims filed by Plaintiff Jimmy Martinez, which arise out DPD's failure to promote him to captain on two occasions.  He subsequently filed EEOC charges, alleging discrimination, retaliation, and a hostile work environment.

    a.  *Facts*

Plaintiff Jimmy Martinez is a lieutenant with DPD.  In 2003, Lieutenant Martinez took the captain's examination and placed seventh on the list for promotion to captain.  Martinez Depo. [#108-2] at 40.  However, DPD only promoted the top six performers, and according to Lieutenant Martinez's response brief, none of these individuals was Hispanic.  *Id*.; [#118] at 3. Lieutenant Martinez took the test again in late 2004 or early 2005 and was first on the promotion list when it was released in March, 2005.  [#118-2].  Despite being listed first, Lieutenant Martinez learned that he would not be promoted after meeting with the Manager of Safety, Alvin LaCabe.  Plaintiff's brief claims that eight others were promoted despite having a lower ranking. Lieutenant Martinez says that no reason was given at the time for failing to promote him.  2006 EEOC Charge.  [#108-1].

Defendant paints a different picture.  Lieutenant Martinez had a pending disciplinary action against him stemming from a November, 2003 incident in which Lieutenant Martinez was working off duty at a bar and hit a patron twice in the head with a baton-like weapon.  [#108-2] at 47-50.  In August, 2004, Captain Edward Lujan recommended a fifteen day suspension after determining that Lieutenant Martinez's use of force was improper. *Id*. at 53.  However, the chief of police recommended a ten day suspension in February, 2005, which was finalized when Manager LaCabe affirmed the ten day suspension on April 13, 2005.  [#108-7]; [#108-2] at 66-67.  Lieutenant Martinez appealed, and the penalty was reduced to a five day suspension on August 26, 2005.  [#108-8]; [#108-2] at 67-68.

On December 20, 2005, Manager LaCabe received a letter listing, in rank order, those eligible for promotion to captain.  [#108-9].  The letter listed Lieutenant Martinez first and said that all eight listed candidates passed a disciplinary history assessment at the time they took the promotion exam.  However, the letter warned that the discipline history had not been updated since that time and recommended a current review to ensure all candidates still meet the standards for promotion.  After reviewing Lieutenant Martinez's disciplinary history and the applicable rules, Manager LaCabe felt Lieutenant Martinez could not be promoted.  LaCabe Depo. [#108-11] at 88:1-14.  Former Chief of Police Gerald Whitman was present when Manager LaCabe informed Lieutenant Martinez he would not receive the promotion.  Whitman Depo. [#108-12] at 77-78.  Chief Whitman recommended that Lieutenant Martinez receive the promotion, because there was no precedent for not promoting the highest ranking person on the list.  *Id*.  However, Chief Whitman also "understood the decision."  *Id*. at 77:15-78:1.

Largely because of this incident, Lieutenant Martinez filed an EEOC charge on March 13, 2006, claiming national origin discrimination and retaliation.  [#108-1].  Plaintiff alleged that he had been "subjected to adverse terms and conditions, job assignment, and promotion and ongoing harassment that has created a hostile work environment."  *Id*.  He claimed that he was denied a promotion from lieutenant to captain and did not receive any explanation as to why.  *Id*.  Lieutenant Martinez also said he had complained about the hostile work environment and racially derogatory comments, and no action was taken to resolve his complaints.  *Id*.  After complaining, he says he was removed to the graveyard shift, that his work is highly scrutinized, and that he is held to a higher standard than his fellow non-Hispanic officers.  *Id*.

Lieutenant Martinez's reference to the graveyard shift stems from his transfer from the Gang Bureau to District 4 in 2005 as a result of a conflict with his then-supervisor, Captain

Lujan. [#108-2] at 21.  Lieutenant Martinez worked in District 4 for approximately three years and reported to Commander Rudy Sandoval, who is also Hispanic.  [#108-4]  While in District 4, Lieutenant Martinez worked on "detail one," which is the night shift, or graveyard shift, and he worked the hours between 8:30 PM and 6:30 AM.  Sandoval Aff. [#108-4].

Commander Sandoval says he already had three outstanding lieutenants working for him, and that he told Lieutenant Martinez that he would be assigned to detail one until another lieutenant transferred.  Sandoval Aff. [#108-4].  ¶ 11.  According to Commander Sandoval, Lieutenant Martinez felt that as senior lieutenant, he should be allowed to work the shift he wants.  *Id*. ¶ 12.  According to Division Chief Mary Beth Klee, lieutenant work shifts and job assignments are determined by factors other than seniority.  Klee Aff. [#108-5] ¶ 5.

On June 19, 2006, one of Commander Sandoval's lieutenants transferred to an assignment outside of the district, and Commander Sandoval offered Lieutenant Martinez this shift from 1:30 PM to 11:30 PM.  Sandoval Aff. [#108-4] ¶ 13.  Lieutenant Martinez declined, because he only wanted detail two, which is a 5:30 AM to 3:30 PM shift.  *Id*.  Commander Sandoval also says Lieutenant Martinez never requested overtime, and the only special work assignment Lieutenant Martinez had ever requested, the 2007 Cinco de Mayo celebration, was granted based upon his seniority over the detail three lieutenant.  *Id*. ¶ 16.  Lieutenant Martinez ultimately returned to the Gang Bureau in 2007 when he learned of an opening on the day shift and requested the transfer.  [#108-2] at 22.

Lieutenant Martinez filed a second EEOC charge on February 5, 2007, again alleging national origin discrimination and retaliation, as well as a hostile work environment.  [#108-3]. In his narrative, Lieutenant Martinez says that after he filed a charge of discrimination in March, 2006, he was forced to work a shift no other lieutenant with his tenure was required to work.  *Id*.

He claims that he was not allowed to work overtime grant functions or special assignments, like the Columbus Day Parade. *Id.*

Finally, Lieutenant Martinez cites some specific instances of what he believes was retaliation for his first EEOC filing. He references a November 1, 2006 incident in which there was an official announcement for the captain's examination posted on his office door instead of in his inbox. [#108-3]. He felt the intent was to publicly belittle him for his first EEOC allegation that he had been passed over for promotion to the rank of captain. *Id.* He says he reported this incident to his supervisor, but no action was taken. He also says that at the end of that month, on November 30, 2006 Chief Whitman ordered Lieutenant Joseph Montoya of the Internal Affairs Bureau to clarify a few points from his initial complaint regarding a racially derogatory picture posted near his office. *Id.* He says the Lieutenant wanted to know why he was offended and if it mattered who posted it. *Id.* Lieutenant Martinez says he felt intimidated by these questions, that he had never asked such questions in response to a discrimination complaint, and that he didn't understand why Chief Whitman would be making this inquiry. He interpreted this behavior as a message that DPD does not want these types of incidents to be investigated or exposed. Lieutenant Martinez felt treated unfairly when he was asked to explain why he was offended. Lieutenant Martinez now works at the airport. [#108-2] at 22.

    b.  *Conclusions*

       i.  *Claim one: Title VII discrimination*

Defendant first argues that some of plaintiff's claims arising out of his first EEOC charge are time-barred. The Court agrees. Title VII requires that a party file a charge of discrimination within 300 days after the alleged unlawful employment practice occurred. *See generally Trujillo v. Huerfano County Bd. Of County Com'rs*, 349 F. App'x 355, 362 n.4 (10th Cir. 2009)(citing

*Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1222 (10th Cir. 2006)); *See also*

*Annett*, 371 F.3d at 1238 (courts lack jurisdiction to consider Title VII claims that are not part of

a timely-filed EEOC charge).  Lieutenant Martinez's first EEOC charge was filed on March 13,

2006.  As a result, any alleged adverse employment actions occurring before May, 2005 cannot

be considered, which includes his 2003 claim for failure to promote.

　　While Officer Abeyta's claims stemmed from one specific incident triggering an alleged

wrongful termination claim, Lieutenant Martinez's discrimination claims arise from more

extensive facts.  As a result, the Court utilizes a slightly different prima facie test while still

applying the same *McDonnell-Douglas* burden shifting framework.  *See E.E.O.C v. PVNF,*

*L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007)(quoting *Plotke v. White*, 405 F.3d 1093, 1099 (10th

Cir. 2005))("The articulation of a plaintiff's prima facie case may well vary, depending on the

context of the claim and the nature of the adverse employment action."). [1]

　　"To make out a prima facie case of discrimination, [the plaintiff] must demonstrate (1)

membership in a protected class, (2) adverse employment action, and (3) disparate treatment

among similarly situated employees."  *Carney*, 534 F.3d at 1273 (10th Cir. 2008).  The last

element may be satisfied by showing that the employer treated similarly situated employees

more favorably.  *Luster v. Vilsack*, 667 F.3d 1089, 1095 (10th Cir. 2011).  If a plaintiff can

---

[1] The Tenth Circuit has noted "tension in our case law regarding what a plaintiff must establish as part of his or her prima facie case of discrimination."  *PVNF*, 487 F.3d at 800, n. 5.  Some prima facie tests require circumstances suggestive of discrimination, while other tests examine the discrimination component when considering whether the employer's stated reason was pretextual.  *Id.* at 800.  "The essential purpose served by the prima facie case, however, remains the same and serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's adverse employment action."  *Plotke*, 405 F.3d at 1099(citations omitted).  In other words, "it was never intended to be rigid, mechanized or ritualistic."  *Id.*  Regardless of whether a court analyzes the plaintiff's discrimination evidence as part of a prima facie case or within a pretext inquiry, "if the court correctly concludes that the evidence of discrimination/pretext fails as a matter of law, summary judgment for the defendant is the proper result."  *PVNF*, 487 F.3d at 800 (quoting *Sorbo v. United Parcel Service*, 432 F.3d 1169, 1173 & n. 5 (10th Cir. 2005)).

satisfy his burden to establish a prima facie case, then the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its decisions.  *Id*. at 1091.

It is undisputed that Lieutenant Martinez is a member of a protected class.  However, defendant argues that only Lieutenant Martinez's failure to promote claim constitutes an "adverse employment action" within the meaning of Title VII.  Lieutenant Martinez does not seem to dispute this.  As a result, the Court only considers Lieutenant Martinez's 2005 failure to promote claim.  Because there is also no dispute that candidates who are ranked first for promotion are generally promoted, the Court finds Lieutenant Martinez has established his prima facie case.  However, defendant has provided a legitimate, non-discriminatory reason based upon his disciplinary history.  As a result, it is Lieutenant Martinez's burden to establish pretext.

Lieutenant Martinez claims that defendant's proffered reason for not promoting him is pretextual and untrue, because the manager of safety is not required to review any disciplinary history once he receives the promotion list.  Strangely, plaintiff argues that Manager LaCabe's decision to review the candidates' disciplinary status is evidence of pretext, because nothing required him to do so.  In support, Lieutenant Martinez cites to the Civil Service Commission Rule 7, arguing that the rules only require individuals to be stricken from the list under certain conditions, and that these conditions do not apply to him.  [#118-3].  Because the rules did not require his name to be stricken, he argues that Manager LaCabe's decision was pretextual.

Rule 7(B) provides that a candidate's name shall be stricken from an eligible register for promotion if "[i]nformation becomes available of such a nature that it had been known prior to placing the name of the applicant or candidate on an eligible register, it would have resulted in the exclusion/disqualification of the individual from further participation in the hiring or promotion process."  Lieutenant Martinez argues that because his disciplinary incident was

already pending and therefore known in 2004, and because he was still permitted to sit for the exam, it is not appropriate to now exclude him from the promotion process.  The Court does not know if Manager LaCabe relied upon this rule or upon Rule 7(A)(3), which would also permit him to strike an applicant's name if there have been  "[a]ny false, incomplete, misleading or misrepresentative statement or any omissions of fact relevant to a determination of qualifications…."  [#118-3] 7(A)(3).

Either way, the Court is not persuaded.  The issue is not whether it was known that Lieutenant Martinez was being investigated for a disciplinary incident but rather, whether or not Lieutenant Martinez had any "disciplinary history."  The parties seem to agree that the discipline was not finalized when Lieutenant Martinez sat for the exam.  In fact, Lieutenant Martinez admits as much: "I believe that would have kept me from taking the exam…."  [#108-2] at 64:22-24.  Additionally, the letter Manager LaCabe received listing eligible individuals specifically recommended "that a current review of their disciplinary history be undertaken to ensure that they still meet the Disciplinary History standards for promotion to the rank of Captain."  [#108-9].  Although it is difficult for the Court to discern whether the rules actually prohibited Lieutenant Martinez from the promotion, there is no reason to doubt that Manager LaCabe genuinely reached this conclusion after reviewing the disciplinary history.  [#108-10]; [#108-11]; *see Hardy*, 185 F.3d at 1080 (noting the "pertinent question" is whether the employer's belief was genuine or pretextual)(citations omitted).  Chief Whitman also seemed to understand Manager LaCabe's reasoning, even though he recommended the promotion.

The Court concludes that Lieutenant Martinez has not established that there is a genuine issue of material fact as to whether Manager LaCabe's reason for not promoting him was

pretextual and discriminatory.  Accordingly, the Court grants defendant's motion for summary judgment as to the Title VII claim.

### ii.  *Claims three and four: § 1981 and § 1983*

For the same reasons the Court grants summary judgment as to plaintiff's claim under Title VII, the Court also grants summary judgment as to his claims under §§ 1981 and 1983.

### iii.  *Claim two: retaliation*

"To establish a prima facie case of retaliation, [a plaintiff] must establish that: (1) he engaged in protected opposition to discrimination; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action."  *O'Neal*, 237 F.3d at 1252.  Lieutenant Martinez's claim for retaliation arises out of his 2006 EEOC complaint, claiming that after he filed this complaint, he was forced to work shifts that no other lieutenants with his tenure were required to work and that he was not permitted special assignments and certain overtime shifts.  However, Lieutenant Martinez was transferred from the Gang Bureau to District 4 in 2005, which is before his first EEOC charge was filed in March, 2006.  As a result, there is no causal connection between working the graveyard shift and Lieutenant Martinez's EEOC complaint.

Lieutenant Martinez also fails to cite to dates or specifics as to when he believes he was denied overtime shifts and special assignments.  Although he generally references "the Columbus Day Parade, etc."  [#108-3], there is no indication as to when this occurred or who denied him that special assignment.  As a result, it is unknown to this Court whether these alleged denials also occurred before Lieutenant Martinez filed his March, 2006 EEOC charge.  If they occurred before he filed his first EEOC charge, then again, there can be no causal connection for retaliation.

Additionally, Commander Sandoval's affidavit says that Lieutenant Martinez never asked him for overtime, and he states that he allowed Lieutenant Martinez to work the only special assignment he ever requested, a Cinco de Mayo Celebration shift which he was given because of his seniority over another lieutenant.  [#108-4].  Although competing testimony between Lieutenant Martinez and Commander Sandoval would create an issue of fact, because Lieutenant Martinez fails to provide any specific instance to support his retaliation claim, the Court finds that Mr. Martinez has failed to satisfy his burden to establish a prima facie case that DPD retaliated against him by denying him overtime or special event shifts.

c.   *Hostile Work Environment*

"To survive summary judgment on a claim alleging a racially hostile work environment, the plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and that the victim was targeted for harassment because of her race or national origin."  *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012).  The applicable test uses a dual standard, asking both "whether the plaintiff was offended by the work environment and whether a reasonable person would likewise be offended."  *Id.*

Although plaintiff's brief was non-responsive to this argument, the Court considers the following facts to be relevant in considering Lieutenant Martinez's claim for a hostile work environment:

- His transfer and assignment to district 4, which required him to work the graveyard shift when he says that no other lieutenant of his seniority worked such a shift.

- The failure to promote Lieutenant Martinez when he was ranked first on the promotion list.

- The November, 2006 posting of the upcoming captain's exam on Lieutenant Martinez's door instead of placing it in his inbox.  [#108-2] at 105-06; *See* EEOC Charge [#108-3].

- The photograph placed near his office, which Lieutenant Martinez perceived as racially derogatory, and Chief Whitman's corresponding request to clarify why the picture offended him and if it even mattered who posted it.  [#108-13].

"In the typical case, the question is whether the quantity, frequency, and severity of the racial, ethnic, or sexist slurs create a work environment so hostile as to discriminate against the minority employee." *Trujillo*, 157 F.3d at 1214 (quoting *Vore v. Indiana Bell Tel. Co.*, 32 F.33d 1161, 1164 (7th Cir. 1994).  Lieutenant Martinez cannot meet his burden to establish a pervasively hostile work environment "by demonstrating a few isolated incidents of racial enmity or sporadic racial slurs." *Herrera v. Lufkin Indust., Inc.*, 474 F.3d 675, (10th Cir. 2007)(quoting *Chavez v. New Mexico*, 397 F.3d 826, 832)(10th Cir. 2005)).  Although a few isolated incidents of sporadic racial slurs or racial enmity is not sufficient to constitute such a showing, "the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact."  *Id.* (quoting *McCowan v. All Star Maintenance, Inc.*, 273 F.3d 917, 923 (10th Cir. 2001).

However, the present case does not even consist of racial enmity or sporadic slurs.  The only evidence of any racial enmity is the photograph posted near Detective Rodriguez's cubicle.  Although Lieutenant Martinez says it was offensive, the content of the photograph appears to have been intended as a pro-immigration statement.  [#108-13].  Detective Rodriguez placed the picture there himself, and Lieutenant Martinez never spoke with Detective Rodriguez about the picture.  [#108-2] at 116.  Lieutenant Martinez largely could not remember the photograph when asked, describing it as "some sort of hat or something, and it had to do with reference to

Mexican-Americans, and it was placed at his cubicle with a note of some sort.  But I don't remember exactly what it was."  [#108-2] at 115:1-5.

None of the other alleged contributors to the hostile work environment shows any racial enmity.  There is no evidence to suggest that the posting of the captain's exam on Lieutenant Martinez's office door was done so out of racial animus.  Lieutenant Martinez even admits that "it could have been somebody who didn't like [him], for whatever reason."  [#108-2] at 108.

Finally, Lieutenant Martinez was assigned to the graveyard shift by Commander Sandoval, who is Hispanic, and there has been no evidence to suggest he received this shift because of his race or national origin.  The Court has also already concluded that Lieutenant Martinez has failed to establish any pretext or racial animus regarding the failure to promote.  As a result, even though claims for hostile work environment are typically unsuited for summary judgment, the Court finds there is no evidence that Lieutenant Martinez was "targeted for harassment because of [his] race or national origin."  Accordingly, the Court grants defendant's motion.

> ### d. *Order*

The Court grants defendant's motion for summary judgment as to Lieutenant Martinez. His claims are dismissed with prejudice.

### III.   Defendant's Motion for Summary Judgment against Plaintiff Leonard Mares [#109]

Defendant seeks summary judgment against Leonard Mares.  Plaintiff gives the Court little support for Mr. Mares' opposition to the motion.  Plaintiff Mares' response brief contains only four lines of additional "facts" without any citation.  [#119] at 3.  The brief is then an exact replica of Jimmy Martinez's response brief.  Defendant points out this error in its seven-page

reply brief.  Unfortunately, plaintiff's counsel appears to be unaware of this error, as there has been no attempt to supplement the briefing or make any corrections.

The Court has nonetheless reviewed what little evidence has been presented.  Plaintiff has filed five exhibits, three of which are Sergeant Mares' own EEOC complaints, one of which is an excerpt of his deposition testimony, and the last of which is an excerpt of deposition testimony said to support the section 1981 and 1983 claims against the City and County of Denver.  As a result, the only evidence supplied in Sergeant Mares' favor consists of his own deposition testimony and his own complaints to the EEOC.  The quality of the copy of the deposition testimony filed on Mr. Mares' behalf is so poor that it was difficult for the Court to read.

Plaintiff has been a police sergeant since 1998.  Sergeant Mares has filed four EEOC charges: one on July 11, 2006 alleging sex and national origin discrimination, as well as retaliation [#119-1];  a second on October 16, 2006, alleging retaliation [#119-2]; a third on September 1, 2009, alleging national origin discrimination and retaliation, with a reference to hostile work environment; [#119-3]; and a fourth charge filed on July 26, 2011, alleging discrimination because of race, national origin, and retaliation.  *Id*. at 2.

Sergeant Mares' first EEOC charge contains only general allegations of harassment by non-Hispanic employees and refers to past filings of complaints.  [#119-1].  There are no specific allegations of harassment or discrimination, and there is no allegation of an adverse employment action.  Sergeant Mares' second EEOC charge, filed in October, 2006 states that in July, 2006 he was forced to share a vehicle with another officer while other non-Hispanic officers were not made to share a car.  [#119-2].  He also references a non-Hispanic female who has harassed him over the years and a friend who says this same female "should have been harder" on him.  He finally alleges that "Respondent" attempted to infiltrate the board of directors of the National

Latino Police Officers Association ("NLPOA").  None of these claims states an adverse employment action, and there is no specificity that would enable the Court to evaluate any of the harassment claims.  Additionally, it appears from Sergeant Mares' deposition testimony that he never was actually required to share a vehicle with another sergeant.  [#109-6] at 286.  Defendant argues that because the sergeants worked different days, they did not use the vehicle at the same time, although Sergeant Mares says that was "never explained to me."  *Id*. at 286:24-25.

Sergeant Mares' third EEOC charge was filed on September 1, 2009, alleging national origin discrimination and retaliation.  [#119-3].  His first allegations involve the treatment of two other Hispanic members of DPD, saying they were unfairly reprimanded for not attending a grand opening of the Purina Plant.  There is no indication that this reprimand was racially motivated.  Sergeant Mares also raises a time-barred 2006 incident in which he felt unfairly reprimanded and then contrasts his experience with a 2009 Denver Post article as evidence of other detectives who were not disciplined for supposedly the same acts.  The Court has insufficient evidence to find any adverse employment action arising out of this EEOC charge.  To the extent any harassment was alleged, there is no indication that such actions were racially motivated.

Finally, Sergeant Mares filed a July, 2011 EEOC charge saying he was humiliated as the result of a news article accusing him of destroying evidence, which he says he did "as a matter of housekeeping."  [#119-3] at 2.  This claim also has no indication of racial motivation or even that defendant had any role in aiding the media's access to Sergeant Mares' deposition testimony, which appears to be the article's source.  [#109-7].  The Court sees no cognizable claim arising out of this charge.

The Court finds that Sergeant Mares has failed to provide evidence of any adverse employment actions. Additionally, the Court has no evidence suggesting discrimination or retaliation. The only events potentially supporting a hostile work environment claim are Lieutenant Sich's "militant Latino organization" comment made to co-plaintiff Reyes Trujillo, for which Sergeant Mares was not present and which allegedly occurred in 2004, and a racist Columbus Day poster, which was posted at police headquarters and then removed. Mares Depo [#109-2] at 22, 74. The Court finds these events, at best, constitute a "few isolated incidents of racial enmity" and falls short of demonstrating that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive…." *Herrera*, 474 F.3d at 680.   Any other allegations claiming a "hostile work environment" lack evidence suggesting any motivation by race.

Accordingly, the motion for summary judgment is granted as to all claims.

IV.   Defendant's Motion for Summary Judgment against Plaintiff Reyes Trujillo [#110]

a.   *Facts*

Mr. Trujillo has been employed by DPD for sixteen years and has been a community resource officer for ten years. Trujillo Depo. [#110-1] at 5-6. As a community resource officer, he is the liaison between the community and police department. *Id*. at 6:9-14. He says he has generally been assigned to detail 2 for the past eight years, meaning that he works from 8 AM until 6 PM four days a week. *Id*. at 6-7.

Mr. Trujillo has filed three charges with the EEOC, the first of which is dated April 21, 2006. In that charge, Mr. Trujillo alleges national origin discrimination, saying he has been denied a promotion and subjected to a hostile work environment. [#120-1]. He also alleges that "[a]lthough the command staff is aware of the National Origin comments and jokes and gestures

in the work environment, no action has ever been taken to stop the discriminatory comments from permeating the work environment." *Id.* In 2004, he says that a non-Hispanic female captain made a derogatory statement regarding the Latino Police Organization in front of other officers. *Id.* After reporting the comment to the commander, he says the captain tried to intimidate him by glaring at him, staring him down, and refusing to speak to him. *Id.* at 2. He says that this captain treats other Hispanic officers similarly and would allow non-Hispanic officers to make national origin comments. *Id.* He believes that DPD lacks policies for reporting discrimination complaints, and that Hispanic police officers fail to pursue complaints because of fear of retribution. Finally, he alleges that in September, 2005, he was passed over for promotion to detective and did not receive an interview even though he was more qualified than his partner, who is not Hispanic and who was offered the position even though he never applied. *Id.* at 2. He also alleges that subsequently, two other non-Hispanic employees were promoted.

Mr. Trujillo filed a second EEOC charge on February 25, 2008 alleging national origin discrimination, retaliation, and age discrimination. [#120-2]. He says he was denied a promotion to intelligence detective in August, 2007, and that he was also denied a promotion to sergeant in late September, 2007. *Id.* He says that the individuals who received the promotions were younger and not Hispanic. He also says that the employee who received the intelligence detective promotion did not have a "title 3 requirement," which was a reason he was given for not being considered for the position. *Id.*

Commander Tony Lopez was the lieutenant in charge of the intelligence division in 2007, and his duties included hiring detectives. Lopez Aff. [#110-5] ¶¶ 2-3. Commander Lopez reviewed applications for two detective positions during 2007 and 2008, and Mr. Trujillo was an applicant. *Id.* ¶ 4. Commander Lopez explains that he selected Dennis Sanchez, a Hispanic, and

Michael Takamoto, an Asian, for those positions.  *Id.*  Mr. Sanchez had twenty years of experience and had been a gang bureau detective for several years, and Mr. Takamoto was previously a detective in the financial crimes unit and had extensive experience as a former financial investigator for a major bank.  *Id.*  Ultimately, Commander Lopez said he considered these individuals to be more qualified than Mr. Trujillo.  *Id.* ¶ 5.

Mr. Trujillo also failed to pass the written examination for sergeant the first two times he applied for it.  [#110-1] at 51-52.  The test is multiple choice and scored by a computer.  *Id.* at 52. In 2007 and 2009, Mr. Trujillo scored high enough on the written examination to be assessed. *Id.* at 55-56.  Mr. Trujillo participated in three sets of oral examinations by assessors who were not from DPD and had different national origins.  *Id.*  Applicants were also assigned numbers so as to not reveal their identities.  *Id.*  Mr. Trujillo placed 66 out of 72 applicants who completed the assessments in 2007, and he finished 61 out of 73 in 2009.  *Id.* at 59, 67.

Mr. Trujillo filed his third EEOC charge on September 2, 2009, again alleging retaliation, as well as age and national origin discrimination.  [#110-4].  He cites to incidents on May 14 and May 19, 2009.  He says he was first orally reprimanded and then received a written reprimand for missing a grand opening.  Mr. Trujillo alleges that other employees have missed meetings or were outside of the district without permission and were not disciplined.  *Id.*  These employees included a white, non-Hispanic female police technician, a black male police sergeant, and an Hispanic male detective.  *Id.*  Finally, he says the commander under whom he works creates a hostile work environment against himself and those who pursue EEOC discrimination complaints and federal discrimination lawsuits against the department.  *Id.*

Lieutenant Sylvia Sich allegedly made the statement that a fellow officer "hides behind a militant Latino organization." [#110-1] at 22:9-10. Lieutenant Sich never supervised Mr. Trujillo. *Id*. at 8.

    b.  *Conclusions*

        i.  *Claim one: Title VII discrimination*

Mr. Trujillo's discrimination claims arise out of three failures to promote, one in 2005 and two in 2007. Regarding his 2005 failure to promote, Mr. Trujillo has alleged that he was a qualified applicant who did not even receive an interview, while his non-Hispanic partner was offered the position when he had not even applied for it. [#120-1]. He also says that two non-Hispanic employees were promoted after this event. *Id*. Mr. Trujillo admits that he does not know who else may have been interviewed for these positions. [#110-1] at 33:14-16.

It would have aided the Court's analysis if either party had provided more evidence in support of its position. However, it is Mr. Trujillo's burden to establish his prima facie case. In examining whether similarly situated employees were treated differently, a "court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees." *Domai v. Discover Financials Serv., Inc.*, 244 F. App'x. 169, 172 (10th Cir. 2007)(quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997)). Mr. Trujillo has not provided any evidence to allow this Court to compare the relevant employment circumstances other than the respective races or national origins of the persons who allegedly received the position. This is insufficient to establish a prima facie case. Even if this Court were willing to presume that the decision to promote a white person over a Hispanic alone could satisfy the prima facie test, Mr. Trujillo has not offered any evidence to suggest that DPD's proffered reason that the individuals selected

were more qualified is pretextual.  As a result, the Court grants summary judgment against Mr. Trujillo regarding the failure to promote in 2005.

Regarding the 2007 failure to promote to intelligence detective, Commander Tony Lopez has explained that he considered other individuals to be more qualified, and he ultimately promoted an Asian and Hispanic to that position.  As a result, Mr. Trujillo has failed to show disparate treatment when another Hispanic individual was selected for that 2007 promotion.  In his February, 2008 EEOC charge, Mr. Trujillo also says he was denied a promotion to sergeant in September, 2007.  However, Mr. Trujillo placed 66 out of 72 applicants in his assessment for sergeant.  Mr. Trujillo has not provided any evidence to suggest the reason for not receiving the promotion was pretextual when he scored so low on the assessment.

As a result, the Court grants summary judgment against Mr. Trujillo arising out of his claim for failure to promote to detective in 2007.

### ii.  *Claim two: Retaliation*

Although Mr. Trujillo alleged retaliation in his EEOC charges, the nature of his retaliation claim is not clear to this Court.  Presumably, Mr. Trujillo argues he did not receive subsequent promotions based on his prior EEOC filings.  Defendant argues that there is no evidence of any causal connection between the protected conduct and adverse employment actions.  The Court agrees.

Mr. Trujillo has not offered any evidence to link the EEOC filings and failures to promote.  Rather, he argues that after the complaints were filed, "Plaintiff was constantly harassed and was still passed over on promotions and was forced to file a third complaint with the EEOC."  [#120] at 7.  However:

> "Unless an adverse action is *very closely* connected in time to the protected activity, a plaintiff must rely on additional evidence beyond mere temporal proximity to establish

causation.  A six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient."

*MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1279-80 (10th Cir. 2005).  Mr.

Trujillo's EEOC complaints were filed in April, 2006, February, 2008, and September, 2009.

The failure to promote in 2007 was at least several months after the April, 2006 filing and is

consequently insufficient to establish a causal connection absent other evidence.  Although Mr.

Trujillo sought a promotion again in 2009, he never filed an EEOC charge arising out of this

failure to promote, nor has he argued this in his briefing.  Consequently, the Court does not

consider the 2009 failure to promote to be part of his case.

### iii.   *Claims three and four: §§1981 and 1983*

For the same reasons the Court granted summary judgment against Mr. Trujillo for his

Title VII claims, the Court grants summary judgment under sections 1981 and 1983.

### iv.   *Hostile Work Environment*

Mr. Trujillo's response brief fails to advance any argument to support his hostile work

environment claim.  As a result, the Court once again is placed in the position of sifting through

plaintiff's evidence for him to determine whether his claim might survive summary judgment.

The facts which appear to support a hostile work environment include: Lieutenant Sich's

comment that a fellow officer "hides behind a militant Latino organization" in 2004; general

allegations, without any dates or specifics, that Lieutenant Sich would admonish other Hispanic

officers; May, 2009 allegations that Mr. Trujillo was orally reprimanded for missing a "grand

opening," and that he received a corresponding negative comment in his Supervisor Situation

Report (SSR) book; and allegations that other police employees missed meetings without any

discipline or were outside of the district without permission and were not disciplined.  These

individuals who were not disciplined, according to Mr. Trujillo's September 2009 EEOC charge, were a white female, a black male, and an Hispanic male.

The Court has difficulty construing these events as constituting a "racially hostile work environment" that is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive…." *Hernandez*, 684 F.3d at 957. The only incidents supporting Mr. Trujillo's claim is Lieutenant Sich's alleged comment from 2004. However, Mr. Trujillo did not file his first EEOC complaint until 2006. As previously discussed, a plaintiff must file an EEOC charge within 300 days of the alleged discriminatory event.

The Court understands that "a hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Tademy v. Union Pacific Corp.*, 614 F.3d 1132, 1138 (10th Cir. 2008)(quoting *Nat'l Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)). "They occur over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* Ultimately, a court may consider the entire scope of a hostile work environment claim as long as an act contributing to the hostile environment occurs within the statutory time period. *Tademy*, 614 F.3d at 1139 (interpreting *Morgan*, 536 U.S. at 105).

However, Lieutenant Sich's comment is the only specific discriminatory allegation, and this Court is unable to link it to anything that happened within the 300 day filing period. The claim that Mr. Trujillo was unfairly reprimanded for missing an event when other employees of varying races were not reprimanded for allegedly similar behavior simply does not even allege the kind of racial enmity or pervasive hostility required to sustain the claim. Accordingly, the Court grants summary judgment as to this claim and consequently to all claims alleged by Mr. Trujillo.

V.      Defendant's Motion for Summary Judgment against Plaintiffs Dean Gonzales, Daniel

Rojas, Kimberly Lovato, and Yolanda Goad-Cunningham [#111]

Defendant seeks summary judgment as to all claims asserted by plaintiffs Dean Gonzales,

Daniel Rojas, Kimberly Lovato, and Yolanda Goad-Cunningham.  Although four separate

response and reply briefs were filed with respect to each individual plaintiff, defendant argues

that none of the four plaintiffs has any evidence supporting their allegations that race or gender

motivated their perceived harassment or discrimination.  The Court considers each plaintiff

below.

a.   Dean Gonzales

Plaintiff Dean Gonzales' claims arise out of DPD's failure to re-hire him after he says he

was forced to resign in May, 2003 when DPD denied his request for leave due to stress.  At that

time, Officer Gonzales says he was receiving death threats from the family of a suspect who died

during an altercation with him, although the suspect died of a cocaine overdose.  In December,

2003, Officer Gonzales applied for reinstatement.  He says he was denied at that time and re-

applied in February, 2005.  Although he received conditional employment, his re-employment

request was eventually denied.  Officer Gonzales says this request was delayed for over a year

without resolution, and that the Civil Service Commission had an incorrect picture of his internal

affairs files because at least two evaluations reflecting near-perfect scores from a supervisory

officer were missing.

On June 6, 2006, Officer Gonzales filed a charge of discrimination with the EEOC

alleging national origin discrimination.  [#121-2].  In the charge, Officer Gonzales says he was

denied reinstatement to his position as a police officer in December, 2005, that he was an

exemplary police officer, that he resigned for personal reasons in May, 2003, that he never

received an explanation regarding his internal affair files or an explanation as to how his work history was poor, that he was only given five minutes to address the Civil Service Commission when non-Hispanics have not been limited on their time, and that other non-Hispanic employees have resigned and later been reinstated without these obstacles. *Id*.

Officer Gonzales admits he does not have a claim for retaliation, nor does he appear to have alleged a hostile work environment claim. As a result, the Court only considers his Title VII claim for discrimination and the corresponding claims under sections 1981 and 1983.

i. *Claim one: Title VII discrimination*

Officer Gonzales admits that any Title VII claims he may have had out of his constructive termination claim are time-barred, but he maintains that the refusal to rehire him in 2005 is actionable. The Court also notes that he resigned "for personal reasons and to explore other career opportunities" in 2003 [#121-2], and as a result, the Court does not believe he stated a claim for constructive termination in his EEOC complaint. However, regarding the refusal to rehire, Officer Gonzales argues that his employment background in his internal affairs file was inaccurate, that he had an outstanding performance record, and that the complaints in his file should not have been given undue emphasis, because he worked in one of the toughest neighborhoods in the city where complaints are the highest. Ultimately, he argues that the denial to reinstate him was unreasonable.

Even assuming that Officer Gonzales can establish a prima facie case for discrimination in the failure to rehire, defendant has provided a legitimate, non-discriminatory reason for the decision – Officer Gonzales' internal affairs records contained numerous excessive force complaints. Defendant has submitted evidence that Officer Gonzales was involved in 72 use of force incidents during his time at DPD, accounting for 19% of the 368 use of force incidents

when compared with other officers in his academy class.  [#111-5].  Officer Gonzales does not appear to dispute the accuracy of these records.  As a result, Officer Gonzales must present evidence that this proffered reason is pretextual.  He has failed to do so.

His argument for pretext is unclear, but it appears to be that the Civil Service Commission got it wrong.  He says he was not given enough time to present his case, and that relevant evidence from his file was missing.  He also claims, without any evidence, that others similarly situated were reinstated or provided with more time.  However, Mr. Gonzales needs to provide more than his argument or belief that the defendant's stated reasons were pretextual in order to avoid summary judgment.  *See Bones v. Honeywell Intern., Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)("To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.").  To demonstrate pretext, a plaintiff must provide evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Jaramillo v. Colorado Judicial Dept.*, 427 F.3d 1303, 1308 (10th Cir. 2005)(quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).  Mr. Gonzales has not provided any such evidence.  Additionally, a court may not "act as a 'super personnel department' that second guesses employers' business judgments." *Simms*, 165 F.3d at 1330.  This is essentially what Mr. Gonzales asks this Court to do.  As a result, the Court grants summary judgment as to this claim.

### ii.  *Claims three and four: §§ 1981 and 1983*

The Court grants summary judgment against Officer Gonzales' §§ 1981 and 1983 claims for the same reasons it grants summary judgment against his Title VII claims.

b.  Daniel Rojas

Plaintiff Daniel Rojas has been employed by DPD since 1983 and was promoted to detective in 1998.  [#1] ¶ 133.  Detective Rojas' claims arise out of an internal affairs investigation, which Detective Rojas believes was conducted outside of normal operating procedure and was discriminatory because he says similarly charged white officers are not forced to endure such investigations.  *Id.* ¶ 135.  Detective Rojas alleges that during the investigation and after it ended, he was given a punitive work assignment.  He says it affected the quality and type of work he did and was denied overtime and other financial incentives he could have received with his prior assignment.  Detective Rojas claims this assignment continued four months after all significant charges had been dismissed.

On May 10, 2006, Detective Rojas filed a charge with the EEOC alleging national origin discrimination [#121-2], and he also filed a complaint with the Office for Civil Rights on July 3, 2006 [#122-1].  He says he self-reported to his supervisors and admitted that he met with informants without first informing a supervisor and without a witnessing officer.  [#122-1].  Detective Rojas believes Division Chief David Fisher's decision to keep the investigation within his control was motivated by racial bias instead of Chief Fisher's purported reason to investigate a pattern of misconduct.  [#122-1] at 2.

In his EEOC charge, Detective Rojas says that the investigation originally concluded in October, 2004 with a recommended three day suspension, but that Chief Fisher would not agree to it and ensured the investigation continued.  [#122-3].  Detective Rojas says that in November, 2005, the manager of safety exonerated him on the "departing from truth" charge but recommended disciplinary action for two procedural violations.  *Id.* at 2.  Detective Rojas agreed to a 20 day suspension and not to appeal.  *Id.*  He says that normally after an investigation, an

employee is allowed off of desk duty, but that he remained on desk duty until April, 2006, four months after the end of the investigation.  Even though he was exonerated of the departing from truth charge, Detective Rojas noticed the charge still listed as "sustained" in the computer in January, 2006.  *Id*.  Detective Rojas says that he requested an investigation but was told it was a "simple mistake."  *Id*.  He says he turned to the NLPOA, which called the local papers.  A few weeks later he says he was offered a detective position in district 3.

Defendant argues this Court should not consider Detective Rojas' narrative attached to his filing with the civil rights office [#122-1] because it is not a sworn statement and contains inadmissible hearsay.  The Court has already reviewed considerable hearsay evidence in the course of this Order, and the Court gives no weight to hearsay that would be inadmissible at trial. Much of Detective Rojas' narrative in his civil rights office complaint overlaps with the content of his EEOC charge, which will be the Court's primary focus.  In this narrative, Detective Rojas discusses the alleged results of Lieutenant Kroncke's investigation pursuant to Chief Fisher's directive, arguing that Lieutenant Kroncke found nothing to support any pattern of misconduct. [#122-1].  However, the Court does not have Lieutenant Kroncke's report and therefore has no knowledge regarding its contents.  Although Detective Rojas lists other non-Latino officers whom he believes were disciplined less harshly, the Court again has no other evidence explaining the circumstances regarding the disciplinary actions taken and thus has no ability to determine if these individuals' circumstances are comparable to Detective Rojas.

i.  *Title VII*

Defendant first seeks summary judgment because Detective Rojas did not file his EEOC charge until May, 2006 when the decision to place him on desk duty and conduct an investigation occurred in 2004.  However, Manager LaCabe's final decision resulting in the

twenty day suspension occurred in November, 2005, which is within the relevant time period. Detective Rojas also says he remained on desk duty after the final disciplinary decision. The Court finds these actions and surrounding circumstances are appropriate for consideration.

In order to sustain his discrimination claim, Detective Rojas must cite to an adverse employment action. Detective Rojas seems to argue that every perceived negative action constituted an adverse employment action, including the Chief Fisher's final report, Deputy Chief Battista's recommendation of a 30 day suspension, Detective Rojas' suspension without pay in November 2005, his reinstatement to desk duty, and the computer report that incorrectly reflected a sustained charge of departing from truth. Title VII discrimination cases have generally defined an adverse employment action as including a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007)(quoting *Hillig v. Rumsfeld*, 381 F.3d 1028, 1032-33 (10th Cir. 2004)). While adverse employment actions are not limited to these acts, a "plaintiff must show that the alleged adverse action caused more than '*de minimis* harm' to or a '*de minimis* impact' upon an employee's job opportunities or status. *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, (10th Cir. 2011); *See also Piercy*, 480 F.3d at 1203 ("[A] mere inconvenience or an alteration of job responsibilities" is not an adverse employment action.). Although an "adverse" employment action in the retaliation context is evaluated by a more lenient standard, "the substantive discrimination provisions of Title VII are limited to adverse actions that affect employment or alter conditions of the workplace." *Id*. at 1203 n. 12 (internal quotations omitted).

The Court finds that Detective Rojas has sufficiently established two adverse employment actions: (1) the final decision by Manager LaCabe in November, 2005, resulting in a 50 day suspension with 30 days held in abeyance [#111-10] at 50:22-25; and (2) Detective Rojas' assignment to desk duty until April, 2006.  Defendant argues that because Detective Rojas was placed on desk duty prior to the 300 day filing period, he cannot sustain this action. However, the Court finds that because Detective Rojas remained on desk duty when it seems he should have been relieved, the action of keeping him on desk duty constitutes its own adverse employment action falling within the 300 day filing period.  Additionally, because Detective Rojas was "not allowed to do any police work" while on desk duty, the Court finds a desk duty assignment constitutes an adverse employment action.

The other actions alleged do not constitute adverse employment actions within the meaning of Title VII discrimination claims.  The other reports prior to recommending suspension prior to Manager LaCabe's final decision were not final and had no effect on Detective Rojas. Similarly, the incorrectly "sustained" departing from truth charge is not an adverse employment action, because Detective Rojas found the alleged error before incurring any harm.

Regarding Detective Rojas' suspension, Detective Rojas admits that he violated the rules for which he was suspended.  [#111-10] at 51.  Additionally, Detective Rojas does not believe Manager LaCabe discriminated against him when he issued this decision.  *Id*. at 49:18-23.  As a result, there is a legitimate, non-discriminatory reason for Detective Rojas' suspension, and Detective Rojas admits the ultimate decision was not pretextual.

Regarding Detective Rojas' additional time on desk duty, defendant claims that he remained under further investigation to determine whether his misconduct would result in demotion.  See Rojas Depo [#111-10] at 61 (explaining that he later learned through Chief

Whitman that there was a "secret investigation").  Detective Rojas says he only learned why he was still on desk duty in March when he was called into Chief Whitman's office.  *Id*. at 64:11-18.  Detective Rojas says he was "under the restrictions long after I completed my suspension time and my investigation was over."  *Id*.  Although Chief Whitman did not ultimately demote him, Detective Rojas believes Chief Whitman discriminated against him by taking Chief Fisher at face value and accepting all of Chief Fisher's other recommendations.  *Id*. at 69:18-25.  Detective Rojas also believes the incorrectly "sustained departing from the truth charge" is suggestive of pretext.  *Id*. at 71.

The Court finds that Detective Rojas has established his prima facie case for discrimination.  He is a member of a protected class, he suffered an adverse employment action, and he was treated differently than others after the completion of a disciplinary action when he was not relieved from desk duty.  Defendant has proffered a legitimate, non-discriminatory reason, which is that Detective Rojas was still under investigation as to whether or not he would be demoted.  However, Detective Rojas has testified that it was a "secret investigation," and that he did not even know why he was still on desk duty when he met with Chief Whitman in March, over three months after his suspension.  It is difficult to understand why, if Detective Rojas was still under investigation, he was unaware of it.  It is also unclear why this recommendation and decision were not part of the original disciplinary recommendation given to Manager LaCabe and why it took an additional four months before Detective Rojas was allowed to return to police work.  Although not an adverse employment action on its own, the "sustained" departing from truth charge in the computer system in January is also cause for suspicion given the surrounding context.  Finally, after Detective Rojas turned to NLPOA, which called the local paper, Detective Rojas says he was offered a detective position in district 3.

The Court finds these circumstances constitute evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Jaramillo*, 427 F.3d at 1308.  As a result, Detective Rojas has demonstrated sufficient evidence of pretext, and the Court denies summary judgment as to this claim.

ii.    *Claim two: Retaliation*

Detective Rojas has not clearly alleged a claim for retaliation.  [#1] ¶¶ 133-138.  Additionally, Detective Rojas never filed an EEOC charge alleging retaliation, and all events at issue occurred before he filed his only EEOC charge alleging discrimination.  Accordingly, the Court grants summary judgment as to any pending claim for retaliation.

iii. *Sections 1981 and 1983*

Defendant seeks summary judgment arguing that Detective Rojas cannot sustain a claim against the City and County of Denver under section 1983, because he has not provided evidence sufficient to establish municipality liability.  A municipality can be found liable under sections 1981 and 1983 only where the municipality itself causes the violation.  *See Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 123 (1992).  "It cannot be held liable for the acts of its employees on a theory of *respondeat superior*."  *Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1188 (10th Cir. 2010).  As a result, the City and County of Denver cannot be made vicariously liable for acts of individuals.  Rather a plaintiff must establish (1) a municipal policy or custom, and (2) a direct causal link between the policy or custom and the alleged injury.  *Carney*, 534 F.3d at 1274.  In order to establish a custom, the actions of the

municipal employees must be "continuing, persistent and widespread." *Id.* (quoting *Gates v. Unified Sch. Dist. No. 449,* 996 F.2d 1035, 1041 (10th Cir. 1993)).

The only evidence that Detective Rojas has only provided in support of municipality liability is the deposition testimony of Captain Sich, in which she discusses her perceived gender discrimination while working at DPD. [#121-5]. In the deposition testimony provided, Captain Sich does not discuss any kind of racial animus. As a result, her testimony is inapplicable to Detective Rojas. Even if Captain Sich's testimony were applicable, deposition testimony from a fellow officer's experience of perceived discrimination is insufficient to establish any kind of municipal policy or custom on behalf of the City and County of Denver. *See Brammer-Hoelter*, 602 F.3d at 1188 ("Municipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."). As a result, the Court grants summary judgment in defendant's favor for these claims.

iv. <em>Conclusion</em>

The Court grants defendant's motion as to claims two, three, and four for retaliation, section 1981, and section 1983 respectively. The Court denies summary judgment as to Detective Rojas' discrimination claim under Title VII regarding his desk duty assignment.

c. <u>Kimberly Lovato</u>

Plaintiff Kimberly Lovato started working for DPD in October, 1998 and was disciplined in September, 2005 for allegations she says were made by her ex-husband, who was also employed by DPD. Her claims arise out of treatment by her commanding officer, relegation to a

desk assignment, alleged denial of promotion requests because of her desk assignment, and other harassing behavior.  [#1] ¶¶ 96-101.

      i.  *Facts*

On June 15, 2006, Officer Lovato filed a charge with the EEOC alleging sex and national origin discrimination.  [#123-1].  She says that she has been employed with DPD since 1998 and never had performance related issues until the new commander came to district 2.  In September, 2005, she says she was wrongfully disciplined after her husband, who is also a police officer, made a false allegation that she had forged documents.  *Id*.  She says DPD tried to charge her with a criminal act, but the district attorney's office declined.  However, she says her non-Hispanic commander reassigned her to desk duty, which is viewed as punishment, and that she was denied a promotion to sergeant because her commander rejected her request to be returned to her position.

She also says she was a witness to an excessive force complaint against an officer and submitted a report to her commander explaining that she did not observe any excessive force.  Approximately two months later, she says she was notified that disciplinary action had been taken against her for falsifying her report.  A 50-day suspension without pay was recommended.  Although other officers also submitted reports saying that there was no excessive force, they were not accused of falsification.  On March 8, 2006, Officer Lovato says that she learned her commander recommended that she be demoted.  On March 28, 2006, Officer Lovato says she filed a harassment and hostile work environment complaint with the chief of police and did not received any response and was unaware of any corrective action.  She believes these actions were due to gender and national origin.  In her complaint, Officer Lovato indicates she was

referred to as a "know-it-all-little-bitch" on one occasion and ordered to clean the kitchen by Lieutenant Sich on another occasion.  [#1] ¶ 101.

> ii.  *Claim one: Discrimination in Violation of Title VII*

As discussed with respect to Detective Rojas, an adverse employment action for Title VII discrimination must be "materially adverse" to an employee's job status, such as termination, demotion, failing to promote, or an unwelcome reassignment with significantly different duties. *See Piercy*, 480 F.3d at 1203.  The Court finds that three of Officer Lovato's allegations could constitute an adverse employment action for Title VII: (1) her two day suspension for violations of DPD rules and regulations for having a police sergeant notarize a personal document for her [#111-11] at 7-8; (2) the relegation to desk duty; and (3) denial of promotions.  It is unclear whether Officer Lovato believes the accusation that she falsified the excessive force report constitutes an adverse employment action, but based upon the information before the Court, the Court believes it does not.

It is debatable whether two days of "suspended time" constitute an adverse employment action within the meaning of a Title VII discrimination claim.  However, because Manager LaCabe imposed the discipline, and because Officer Lovato admits that she did not believe Manager LaCabe was discriminating against her, [#111-11] at 20:3-17, the Court finds that defendant has proffered a legitimate, non-discriminatory reason for its action and that Officer Lovato admits the reason proffered was not pretext for discrimination.

Regarding Officer Lovato's placement on desk duty, Officer Lovato was being investigated for forgery by Colorado Bureau of Investigation ("CBI") as a result of her ex-husband's allegation.  [#111-11] at 10:11-12.  Officer Lovato was placed on desk duty at that time and acknowledges that it is standard operating procedure for officers under investigation to

be assigned to desk duty.  *Id.* at 20-21.  However, Officer Lovato maintains that she was on this restrictive duty until March, 2006 and was unable to work secondary shifts or receive promotions.  Commander Jones' affidavit indicates that CBI did not exonerate Ms. Lovato, and that she still "harbored serious doubts about Lovato's honesty and integrity.  Because of these doubts, I believed that Lovato's effectiveness as an officer on the street had been severely compromised."  [#111-13] ¶ 10.  Although Officer Lovato argues that defendant failed to proffer a legitimate, non-discriminatory reason for its action, Commander Jones' affidavit constitutes such a reason.  Officer Lovato's only argument for pretext is that Commander Jones forced her to remain on desk duty after Chief Whitman ordered that she return to full duty in March, 2006. [#111-11].  In support, Officer Lovato provides a letter she sent to Chief Whitman, but there is no indication regarding Chief Whitman's response.  [#123-3].  Officer Lovato says she remained on desk duty until she transferred out in July, 2006.

Officer Lovato has failed to provide any evidence to suggest that Commander Jones' actions were motivated by race or gender.  Rather, Officer Lovato asserts her own belief: "It was a known fact, common knowledge, that Rhonda Jones and one other of her lieutenant had issues with female officers."  [#111-11] at 32:3-5.   "To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."  *Bones*, 366 F.3d at 875.  Officer Lovato has not supplied any evidence beyond speculation or conjecture.

Although the Court determined that Detective Rojas established sufficient "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" to suggest that his desk duty assignment may have been pretextual, Officer Lovato's circumstances are not analogous. Detective Rojas had already been disciplined, did not know why he remained on desk duty, and

later learned of a pending "secret" investigation about whether or not to demote him.  His

extensive investigation for a "pattern of misconduct" was also initiated by the same supervisor

who sought his demotion and who kept him on desk duty.  The charge for which he had been

exonerated also remained in his record.  These facts created an issue of material fact as to

whether or not his desk assignment was pretextual.  In contrast, Officer Lovato's desk duty arises

out of her supervisor's mistrust when CBI did not exonerate her for the underlying charges.

Additionally, the charges and investigation were initiated by Officer Lovato's ex-husband, not

the supervisor who also placed her on desk duty.  Without additional evidence, Officer Lovato

has failed to establish pretext.

Finally, Officer Lovato has not made any case for the failure to promote.  She became a

sergeant in February, 2007, and she acknowledges that she applied for a promotion in 2006 and

was promoted in a timely fashion.  [#111-11] at 34:6-9.  Although her June, 2006 EEOC

complaint says she was denied for the position of sergeant because of her commander, her

response brief barely addresses the claim with no citation to the record and with a general

statement that she "was repeatedly denied promotion requests because of her current desk

assignment."  [#123] at 5.  Without further argument and evidence, the Court relies upon Officer

Lovato's own deposition testimony.  Accordingly, the Court finds there is no such claim for

failure to promote.

As a result, the Court grants summary judgment as to this claim.

### iii.  *Retaliation*

Officer Lovato did not allege any facts supporting a claim for retaliation in her complaint,

nor did she file an EEOC charge alleging retaliation, either through the attached narrative or by

checking the retaliation box.  As a result, the Court grants summary judgment as to this claim.

44

iv.  *1981/1983*

For the same reasons Officer Lovato's claim fails under Title VII, they fail under sections 1981 and 1983.   Although Officer Lovato attached Captain Sich's deposition testimony to support her claim against the City and County of Denver, this Court has already noted that the deposition testimony of another employee's perceived discrimination is insufficient to establish municipal liability.   As a result, even if Officer Lovato could sustain her Title VII claim, her §§ 1981 and 1983 claims fail.

v.  *Hostile work environment*

To survive summary judgment on a claim alleging racially hostile work environment, Officer Lovato must show that she "was targeted for harassment because of her race or national origin." *Hernandez*, 684 F.3d at 957.; *See also Morris v. City of Colorado Springs*, 666 F.3d 654, 663 (10th Cir. 2012)(a plaintiff must "show (1) that she was discriminated against because of her sex; and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms of conditions of her employment and created an abusive working environment."). Although Officer Lovato's response brief fails to address this claim, the Court finds that the events supporting Officer Lovato's hostile work environment claim include: her initial desk duty assignment, which was rescinded in March, 2006 by Chief Whitman; her continued desk duty after March, 2006 until she was transferred out in July or August, 2006; the allegation that she falsified her excessive force testimony when other officers were not similarly accused; her belief that she received this treatment as a woman: "It was a known fact, common knowledge, that Rhonda Jones and one other of her lieutenant had issues with female officers."  [#111-11] at 32:3-5; the order to clean the kitchen; the reference to her as a "know-it-all-little-bitch."

The only race or gender based allegations fall outside of the 300 day filing time frame. The "know-it-all-little-bitch" comment was made in 1999, approximately 6-7 years before she filed her EEOC charge.  [#111-11] at 52.  The kitchen cleaning incident occurred in June, 2004. *Id*. at 53:24-54:1.  Officer Lovato filed her EEOC charge in 2006.  Although this Court has noted that because a hostile work environment claim is composed of a series of separate acts and that the Court may consider events outside of the 300 day filing requirement, the Court must also find the acts outside of that time frame sufficiently relate to acts alleged within the applicable time frame.  *See Tademy,* 614 F.3d at 1139.  The Court finds this one comment made by a sergeant in 1999 and one incident in which a female supervisor required Officer Lovato to clean the kitchen are not sufficiently related to any allegations within the 300 day filing requirement. Additionally, these incidents do not establish the pervasiveness required to sustain a hostile work environment claim.

Officer Lovato has also failed to provide this Court with any evidence surrounding her claim that she was wrongly accused of falsifying her excessive force testimony when other officers were not similarly accused.  Beyond this plain statement, the Court has no knowledge as to the specifics of what Officer Lovato says occurred, who else provided similar reports, how they were treated, or even how the alleged disciplinary action that Commander Jones initiated against Officer Lovato was ultimately resolved.  Without more information or evidence, the Court cannot sustain a harassment claim on this allegation.  Additionally, beyond Officer Lovato's assertion that Commander Jones dislikes Hispanic women, there is no reason to believe Commander Jones' behavior stemmed from racial or gender animus.

Ultimately, Officer Lovato has failed to demonstrate that the workplace was permeated with discriminatory intimidation, ridicule, and insult. *See Hernandez*, 684 F.3d at 957.  As a result, the Court grants summary judgment as to this claim.

> vi.   Conclusions

The Court grants summary judgment against Officer Lovato as to all claims.

> d.   Yolanda Goad-Cunningham

> i.   *Facts*

Plaintiff Yolanda Goad-Cunningham alleges that she has been systematically harassed because of her race by her supervisor Sergeant Sullivan.  Her complaint cites two events, one in 2004 and the other in 2005, in which she believes Sergeant Sullivan treated her unfairly.  [#1] ¶¶ 78-79.  She alleges that Sergeant Sullivan refused to approve an overtime request for her when the Sergeant approved an identical request for a white officer.  She also accuses Sergeant Sullivan of deliberately failing to relay her notification that she would be late for work, and she was verbally reprimanded by a different sergeant for failing to call her supervisor.  Ms. Goad-Cunningham filed a formal complaint with DPD on April 20, 2005 regarding her perceptions of Sergeant Sullivan's behavior, but she did not file a formal EEOC charge until October 18, 2007.  As a result, defendant contends that any claim by Ms. Goad-Cunningham is time-barred.  Ms. Goad-Cunningham's response appears to argue that her claims are not time-barred because they arise out of a "pattern of practice."

> ii.   *Title VII discrimination, retaliation, and hostile work environment*

First, the Court finds that Ms. Goad-Cunningham has not alleged any adverse employment action, nor does the complaint contain any allegations to support retaliation.  Although her deposition testimony refers to being "forced to retire" in 2007, the Court has no

evidence regarding the circumstances of her retirement, nor are there any allegations in the complaint to suggest constructive termination or forced retirement.

Defendant argues that Ms. Goad-Cunningham cannot sustain any claims because the acts pled in the complaint are well beyond the 300 day requirement under Title VII.  To the extent Ms. Goad-Cunningham has alleged any retaliation claim, the Court agrees.  With respect to her hostile work environment claim, this Court has already acknowledged that it may consider the entire scope of a hostile work environment claim as long as an act contributing to the hostile environment occurs within the statutory time period.  *Tademy*, 614 F.3d at 1139 (interpreting *Morgan*, 536 U.S. at 105).  Ms. Goad-Cunningham filed an extensive EEOC charge, alleging events dating back to 1995.  [#124-1].  The Court has reviewed Ms. Goad-Cunningham's EEOC charge with respect to events alleged within the 300 days before her EEOC filing.

The only allegation that remotely relates to the 2004 and 2005 events alleged is Ms. Goad-Cunningham's statement from January, 2007, in which she says her past complaint against Sergeant Sullivan was sustained but does not elaborate as to what this means.  She also says that an injured co-worker received an assignment she wanted that would have allowed her to be away from Sergeant Sullivan, whom she accused of harassing her previously.

To determine whether acts alleged within the applicable time frame are sufficiently related to acts beyond the time frame, courts should look at "the type of these acts, the frequency of the acts, and the perpetrator of the acts." *Tademy*, 614 F.3d 1132.  There is no allegation of other acts committed by Sergeant Sullivan in 2007.  Additionally, there is no evidence to suggest that the perceived harassment was due to race or sex.  Even Ms. Goad-Cunningham admits as much:  "He…never blatantly said anything about my race.  But his constant and blatant and

continuous aggression and demeaning activity toward me, for no other apparent reason, led me to believe in my heart that that is the reason for his continuous behavior." [#111-8] at 12.

To survive summary judgment, Ms. Goad-Cunningham must show she was "targeted for harassment because of her race or national origin." *Hernandez*, 684 F.3d at 957. In addition to finding that Ms. Goad-Cunningham's claims are time-barred, she has also failed to allege or sustain facts supporting her contention that she was targeted for harassment because of her national origin. Accordingly, the Court grants summary judgment in defendant's favor as to Ms. Goad-Cunningham's hostile work environment claim.

### iii. *Custom/practice re:1983 and 1981*

For the same reasons explained above, the Court grants summary judgment as to Ms. Goad-Cunningham's sections 1981 and 1983 claims. As repeatedly noted with her co-plaintiffs, Ms. Goad-Cunningham also cannot sustain a custom or policy of a municipality through the deposition testimony of a fellow employee who also felt the effects of discrimination. As a result, the Court grants summary judgment as to claims brought pursuant to sections 1981 and 1983.

**Order**

1. Defendant's motion for summary judgment as to Mr. Abeyta [#107] is GRANTED, and his claims are dismissed with prejudice.

2. Defendant's motion for summary judgment as to Mr. Martinez [#108] is GRANTED, and his claims are dismissed with prejudice.

3. Defendant's motion for summary judgment as to Mr. Mares [#109] is GRANTED, and his claims are dismissed with prejudice.

4.  Defendant's motion for summary judgment as to Mr. Trujillo [#110] is GRANTED, and his claims are dismissed with prejudice.

5.  Defendant's motion for summary judgment as to [#111] is GRANTED IN PART and DENIED IN PART.  The Court grants defendant's motions in their entirety as to plaintiffs Dean Gonzales, Kimberly Lovato, and Yolanda Goad-Cunningham.  The Court grants in part and denies in part defendant's motion regarding Mr. Rojas.  The Court grants defendant's motion as to claims two, three, and four with respect to Mr. Rojas but denies the motion as to claim one.  Mr. Rojas' claim for Title VII discrimination may proceed.

DATED this 5th day of September, 2012.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge